# *UNITED STATES MAGISTRATE JUDGE*
# *U.S. DISTRICT COURT BUILDING*
# *WASHINGTON, D.C.*

PLEASE ISSUE: ☐ Arrest ☑ Search ☑ Seizure

warrant for:        314 SHELBY STREET, SHELBYVILLE, INDIANA UNDER RULE 41

Violation: ☑ D.C.C. ☑ U.S.C.        Title: 18; 40; 22

Section(s):    118 U.S.C. §1512(c)(2) ;18 U.S.C. §§ 1752(a)(1), (2) (4) and (b)(1);40 U.S.C. § 5104(e)(1)(A)(i), (2)(D) and (F); 18 U.S.C. § 231(a)(3); 18 U.S.C. § 111(a)(1) and (b); 22 D.C.C. §4504; 7 D.C.C. §§ 2502.01 and 2506.01

/s/ Tejpal Chawla                                          November 16, 2021
_____                                    _____
Tejpal Chawla                                              Date
Assistant United States Attorney

---

COMPLETE FOR ALL ARREST WARRANTS:

*The following information __must__ be provided for __ALL__ arrest warrants and an **original** and **duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name:    Richard Larity

Badge Number:    5005

Agency / Unit:    U.S. Capitol Police Department

24 Hour Telephone Number:    202-631-4126
 (For officer/agent)

Cellular Number:    202-631-4126
 (For officer/agent)

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>314 SHELBY STREET, SHELBYVILLE,<br>INDIANA UNDER RULE 41 | )<br>)<br>)<br>)<br>)   Case No. 21-sw-391 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereby incorporated by reference.

located in the _____Southern_____ District of _____Indiana_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B hereby incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §1752(a)(2) | Obstruction of a Congressional Proceeding and of a Grand Jury Proceeding |
| 18.S.C. §§ 1752(a)(1), (2) (4) and (b)(1) | Activity on Restricted Grounds While Armed |
| 40 U.S.C. § 5104(e)(1)(A)(i), (2)(D) and (F) | Restricted Activity on U.S. Capitol Grounds, including possessing a firearm |
| 40 U.S.C. § 5104(e)(1)(A)(i), (2)(D) and (F) | Civil Disorder |
| 18 U.S.C. § 231(a)(3) | Assaulting, Resisting, or Impeding Certain Officers or Employees while armed |
| 18 U.S.C. § 111(a)(1) and (b) | Carrying a Pistol without a License |
| 22 D.C.C. §4504 | Unregistered Firearm and Unregistered Ammunition |
| and 7 D.C. Code §§ 2502.01 and 2506.01 | |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Richard T. Larity*

Digitally signed by Larity, Richard T.
DN: cn=Larity, Richard T.,
email=Richard.Larity@uscp.gov
Date: 2021.11.16 12:09:00 -05'00'

*Applicant's  signature*

Richard Larity, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:   _____11/16/2021_____

*Judge's signature*

City and state:  _____Washington, D.C._____          Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-sw-391 |
| 314 SHELBY STREET, SHELBYVILLE, | ) | |
| INDIANA UNDER RULE 41 | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____Indiana_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereby incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B hereby incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____November 30, 2021_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate Judge Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   11/16/2021 _____

City and state:   Washington, D.C. _____          _____
                                                              *Judge's signature*

                                                              Robin M. Meriweather, U.S. Magistrate Judge
                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-sw-391 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

314 Shelby Street, Shelbyville, IN 46176 (TARGET LOCATION)



The TARGET LOCATION to be searched is the premises and real property at 314 Shelby Street, Shelbyville, IN 46176, further described as a 1 level house. The dwelling is mostly covered with yellow siding, black shutters on the front window. The front porch is comprised of red brick and red brick columns. The dwelling is located upon the east curb, third house south of the intersection with Hendricks Street. The screen door is now brown in color. The number 314 is written out "THREE FOURTEEN" in italics to the left of the front door.  The property is located in the Southern District of Indiana.

The resident of the TARGET LOCATION is Mark Andrew Mazza, a white male, approximately 5'06", with a date of birth in the year 1964, and a Social Security Number ending in 7941. Mazza is depicted below.





## **Attachment B**

## PROPERTY AND EVIDENCE TO BE SEIZED

The items, documents, records, and material to be seized are fruits, evidence, relating to violations of 18 U.S.C. §1512(c)(2) (Obstruction of a Congressional Proceeding and of a Grand Jury Proceeding); 18 U.S.C. §§ 1752(a)(1), (2) (4) and (b)(1) (Activity on Restricted Grounds While Armed) 40 U.S.C. § 5104(e)(1)(A)(i), (2)(D) and (F) (Restricted Activity on U.S. Capitol Grounds, including possessing a firearm); 18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers or Employees while armed); 22 D.C. Code §4504 (Carrying a Pistol without a License), and 7 D.C. Code §§ 2502.01 (Unregistered Firearm), and 2506.01 (Unregistered Ammunition ("Subject Offenses") as described in the search warrant affidavit, including, but not limited to:

1. Information which indicates Mazza committed or participated in any of the above Subject Offenses;
2. All evidence, records, notebooks and material showing Mazza's location on January 6, 2021, including travel records, receipts and information related to travel to the District of Columbia;
3. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with Mazza about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;
4. Information that constitutes evidence concerning unlawful presence, entering, or remaining on the grounds and within the buildings of the U.S. Capitol;
5. Information that constitutes evidence concerning the possession of firearms, including any firearms, ammunition, and gun paraphernalia, including but not limited to, any receipts, photographs, emails, documents, records and material showing ownership of firearms or the Taurus Revolver;
6. All firearms, ammunition, batons and asps, and information about their ownership;
7. Information that constitutes evidence concerning any assault of a federal law enforcement officer, or other person on January 6, 2021;
8. Information, videos, and photographs related to the attack on the U.S. Capitol on January 6, 2021, including evidence concerning persons or groups constituting an assemblage or procession of persons on the United States Capitol Grounds where they are uttering loud, threatening, or abusive language, or engaged in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress, and persons or groups conducting an unlawful parade, demonstration, or picketing in any of the Capitol Buildings;
9. Records, including writings, photographs, and videos that constitute evidence of a person's location on the grounds and within the buildings of the U.S. Capitol;
10. All records, writings, documents, letters, emails, correspondence, notes and notebooks discussing the events of January 6, 2021, or which evidence Mazza's state of mind on January 6, 2021 or his intent to obstruct a pending law enforcement or grand jury

investigation, including, but not limited to his intent on January 8, 2021 (when he first filed a false police report regarding his firearm) and March 25, 2021 (when he was interviewed by law enforcement);

11. Evidence related to Mazza's false statements to local law enforcement and the U.S. Capitol police, including Mazza's contacts before and after communicating with law enforcement;

12. Clothing matching those that Mark Andrew Mazza was wearing on January 6, 2021, including, but not limited to any property that meets the following description:

    a.      Red, white and blue in color baseball cap with the work "TRUMP" across the front of the hat in large red letters;

    b.      Tan in color jacket;

    c.      Tan in color cargo-style style pants.

    d.      Blue in color hooded sweatshirt, with a yellow emblem on the left breast and a white emblem on the right breast.

    e.      Shoulder gun holster; and

    f.      Metallic color glasses with possible auto-tint feature.

The above records, information, and material can be recovered from any safe, box, or closed container at the Target Location.  If law enforcement has specific reason to believe that any electronic device, computer, mobile device, or electronic storage device contains responsive materials (*e.g.,* the item is marked 1/6/21, or a witness identifies the item as containing electronic responsive material), it may seize those items from the location, but will seek additional legal process from this Court or another court of competent jurisdiction before searching that material (if consent to search is not obtained).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH OF:**
**314 SHELBY STREET, SHELBYVILLE,**
**INDIANA UNDER RULE 41**

**SW No. 21-sw-391**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Richard Larity, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the United States Capitol Police (USCP), where I have served since January 2002.  I am currently assigned to the Investigations Division, Criminal Investigations Section.  I have attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.   I have received training and gained experience in arrest and search warrant applications, the executions of arrest and search warrants, and various other relevant training. In my current assignment, I have been involved in numerous cases involving the assaulting, resisting or impeding certain officers or employees.

2.      This affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, database and public records checks, searches, and other investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**PURPOSE OF AFFIDAVIT**

3.      I make this affidavit in support of an application under Rule 41, Federal Rules of Criminal Procedure, for search warrants for the premises and real property at 314 Shelby Street,

Shelbyville, IN 46176 ("TARGET LOCATION"), as more particularity described in Attachments A (Attached hereto and incorporated by reference as if fully set forth herein); for any evidence, fruits of the crime, contraband and instrumentalities of crimes committed by Mark Andrew Mazza (Mazza).

4.      For the TARGET LOCATION to be searched, I request authority to search all parts of the property, including main structure, storage structures, outbuildings, and curtilage, and all persons, containers, compartments, filing cabinets, drawers, or safes located on the property, whether locked or not, where the items described in Attachment B (list of items to be seized) could be found.

5.      On November 12, 2021, The Honorable Magistrate Judge Zia Faruqui of the United States District Court for the District of Columbia signed issued an arrest warrant for Mazza and signed a Criminal Complaint that charged Mazza with violations: 18 U.S.C. §1512(c)(2) (Obstruction of a Congressional Proceeding and of a Grand Jury Proceeding); 18 U.S.C. §§ 1752(a)(1), (2) (4) and (b)(1) (Activity on Restricted Grounds While Armed) 40 U.S.C. § 5104(e)(1)(A)(i), (2)(D) and (F) (Restricted Activity on U.S. Capitol Grounds, including possessing a firearm);  18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers or Employees while armed); 22 D.C. Code §4504 (Carrying a Pistol without a License), and 7 D.C. Code §§ 2502.01 (Unregistered Firearm), and 2506.01 (Unregistered Ammunition). for criminal conduct related to the Capitol Riot on January 6, 2021 (collectively, hereafter, the Subject Offenses).[1] *See United States v. Mark Andrew Mazza*, 21-MJ-0655 (ZMF).

---

6.      As this Affidavit is submitted only to establish probable cause for the requested warrant, I have set forth only the facts that I believe are essential for a fair determination of probable cause for the requested warrant.  This affidavit does not purport to set forth all of my knowledge or all facts known to law enforcement concerning this investigation.

## JURISDICTION AND VENUE

7.      Pursuant to Federal Rule of Criminal Procedure 41(b)(3) this Court has authority to issue a search warrant outside of the District of Columbia in investigations of domestic terrorism.  Specifically

> A magistrate judge – in an investigation of domestic or international terrorism – with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district.

*Id.*  This provision was added in 2002 as part of amendments that incorporated Congressional changes to this Rule under the USA PATRIOT ACT.  As explained by the Rules Committee, "The provision explicitly addresses the authority of a magistrate judge in an investigation of domestic or international terrorism.  As long as the magistrate has authority in a district where activities related to terrorism may have occurred, the magistrate judge may issue a warrant for persons or property not only within the district, but outside the district as well." *See Federal Criminal Code and Rules* (Thompson Reuters) at 168 (2018 Revised Ed.).  The term "domestic terrorism" as used in the Rule (*id.* at Rule 41(a)(2)(D) is the same as it is in 18 U.S.C. §2331, and means,

> Activities that
> (A)     involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any state;
> (B)     appear to be intended to . . . (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and
> (C)     occur primarily in the territorial jurisdiction of the United States.

18 U.S.C. §2331 (5).

3

8.     As discussed below, the United States and a grand jury in this District, are investigating acts of domestic terrorism that relates to an attack on the U.S. Capitol in the District of Columbia on January 6, 2021.  This investigation involves acts of domestic terrorism because persons under investigation in this matter were: (1) involved in violence with dangerous and deadly weapons directed at law enforcement officers, members of Congress, and the Vice-President of the United States, in violation of numerous federal and D.C. laws; (2) the subjects under investigation indicated they intended to change and influence the policy of the United States regarding the lawful Presidential Succession, which is determined in accordance with federal law and the U.S. Constitution, using coercive and intimidating acts (which included direct violence and continued threat of violence if the U.S. Congress reassembled); (3) subjects under investigation indicated they were attempting to affect the conduct of the U.S. Congress that was voting on the certification of the Electoral College for the lawful Presidential Succession by direct violence, including the kidnapping or murder of the Vice-President of the United States; and (4) the activities under investigation occurred primarily in the territorial jurisdiction of the United States.

9.     Your affiant understands This Court has previously authorized a search warrant in this investigation under Rule 41(b)(3) in *In re the Matter of the Search of One Apple iPhone Under Rule 41*, 21-SW-253.

## **PROBABLE CAUSE**

### *Background – The U.S. Capitol on January 6, 2021*

10.     The USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

11.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which included the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

12.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

13.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

14.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 (Certification).  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

5

15.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

16.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

17.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

18.     Media reporting at the time of the riot showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."

19.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

20.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



21.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

22.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  A significant number of federal police officers sustained injuries during the riot. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by known and unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

23.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

24.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

25.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



26.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



27.     A person who entered the Capitol with the other rioters left a note on the podium on the floor of the Senate Chamber.  The note, filmed by a reporter, stated "It's Only a Matter of Time Justice is Coming."   The person who left the note was subsequently identified by law enforcement, and that person's identity is known to your affiant.



28.     During the riot, multiple subjects were observed inside the U.S. Capitol wearing what appear to be tactical vests and carrying flex cuffs.  Based upon my knowledge, training and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





29.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

30.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

31.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

32.     Between 3:25 p.m. and around 6:30 p.m. EST, law enforcement officers were able to clear the U.S. Capitol of all unauthorized entrants.

33.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized entrant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

34.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

35.     Beginning around 9:00 p.m., the House resumed work on the Certification.

36.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

37.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of

12

violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

38.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

39.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, and photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities on various social media platforms.

### *Facts Specific to Mazza*

40.     Since January 6, 2021, there has been an active federal investigation into the events surrounding the Capitol Riots.  That investigation has gathered a significant amount of evidence and data, including data identifying electronic devices and cellular telephones in use around the U.S. Capitol on January 6, 2021.  A federal grand jury investigation in the District of Columbia was also initiated shortly thereafter in January 2021.

41.     Your affiant is aware that on January 6, 2021, at approximately 2:30 p.m., a large crowd, including an unidentified individual (S-1), unlawfully climbed atop the wooden platform erected for the upcoming presidential inauguration on the grounds of the U.S. Capitol and in front of the U.S. Capitol building. S-1 attempted to physically overtake a uniformed U.S. Capitol Police

(USCP) Sergeant (USCP Sergeant) who was attempting to keep the individuals from the U.S. Capitol Building.   S-1 grabbed and pushed USCP Sergeant backwards.   The USCP Sergeant defended himself by using defensive techniques with a USCP issued baton.   During this encounter, S-1 fell face down upon the wooded platform and when doing so, an object fell from S-1's front waistband area of his pants, landing at the feet of the USCP Sergeant.   This object was clearly a firearm, in particular a pistol, and was picked up by the USCP Sergeant to remove the threat. The USCP Sergeant subsequently inspected the firearm, located a serial number, and identified it as a loaded Taurus revolver branded as the "The Judge" (Taurus Revolver).

42.    After the USCP Sergeant recovered the firearm that had fallen from the individual's waistband, S-1 fled the area with the assistance of others in the large crowd who blocked the USCP Sergeant and other law enforcement officers.   While S-1 was not apprehended, the subsequent USCP investigation has led your affiant to conclude S-1 was Mark Andrew Mazza.

43.    On January 7, 2021, the Criminal Investigations Section of the U.S. Capitol Police was notified by a U.S. Capitol Police Sergeant (CW-1), that while supervising and being a member of the U.S. Capitol Police Civil Disturbance Unit (CDU) on January 6, 2021, CW-1 had been assaulted by an unidentified protester (S-1).   CW-1 indicated he was on the West Front Terrace area at approximately 2:30 PM, when persons broke through the police line at the area near the steps of the U.S. Capitol building.   CW-1 further stated that S-1, with others, attempted to physically overtake CW-1 and other members of the CDU who were attempting to stop them. CW-1 stated that S-1 grabbed him with both hands and pushed CW-1 backwards.   CW-1 defended himself and struck S-1 with his baton, who then fell face down upon a wooden platform and when doing so, an object fell from the S-1's waistband area of his pants, landing at the feet of CW-1. CW-1 indicated the object was clearly a firearm, that being a pistol, and CW-1 picked up the

weapon to remove the threat from other persons who were still assaulting law enforcement officers. Shortly thereafter, CW-1 inspected the Taurus Revolver, located a serial number, and identified it as a loaded Taurus "The Judge" revolver, which contained five (05) rounds of live ammunition. The ammunition consisted of three (3) .410 gauchge shotgun shells and two (2) .45 caliber hollow point rounds.  Your affiant is aware that the Taurus Revolver is one of a few handguns that can fire both shotgun shells and regular bullets through the barrel.  When shotguns shells are fired through such a pistol, the effect is similar to the discharge of a short barreled or sawed-off shotgun. Your affiant is also aware that hollow point rounds expand on impact and can be more lethal than regular bullets.  The fact that the Taurus Revolver also contained shotguns shells indicates an intent to be able to use the weapon against multiple targets at the same time.

44.     CW-1 said that after CW-1 recovered the Taurus Revolver, S-1 fled the area with assistance of others in the large crowd who blocked W-1 and other law enforcement officers, preventing S-1 from being apprehended.  CW-1 then had the Taurus Revolver processed and placed into evidence by the U.S. Capitol Police Crime Scene Unit. The Taurus Revolver was fingerprinted and swabbed for DNA.

45.     On January 11, 2021, your affiant initiated a criminal investigation and performed an ATF-E-Trace of the Taurus Revolver's serial number. On January 11, 2021, the serial number of the Taurus Revolver was checked against the records of the Gun Registration Unit within the District of Columbia, Metropolitan Police Department.  This check revealed that no certificate of firearms registration, a prerequisite for firearms possession in the District of Columbia, existed for the Taurus Revolver.  A check of the National Crime Information Center (NCIC) law enforcement data base revealed that the Taurus Revolver was not reported to be stolen from any jurisdiction at that time.

46.     On January 28, 2021, I was contacted by the Alcohol Tobacco & Firearms (ATF) and was advised that that the Taurus Revolver had been reported stolen by Mark Andrew Mazza on January 8, 2021, to the Shelbyville Police Department in the state of Indiana.  An additional search of the ATF E-Trace on that same date revealed that the firearm's original purchaser was listed as Mazza, with a specific address located in Franklin, Indiana.

47.     According to the Shelbyville Police Department, on or about January 8, 2021, Mazza called the department from telephone number 317-727-7593, and claimed that his Taurus Revolver had been stolen.  According to Mazza's statement to the Shelbyville Police Department, Mazza claimed to have left his Taurus Revolver in his rental car when he arrived at the Hard Rock Casino in Cincinnati, Ohio, on January 5, 2021, at approximately 10:30 am.  Mazza stated that he then went into the casino, and when he returned to the car on January 6, 2021, at 12:00 am, the Judge Revolver was missing.

48.     Mazza further stated to the Shelbyville Police Department that he drove home from Ohio to Shelbyville, IN, on January 6, 2021, because he did not want to report the missing firearm to the casino police, and after arriving home, he went to bed because he was tired.   Mazza also stated that he did not have the firearms serial number at the time, but he would update the Shelbyville Police Department once he had it.  On or about January 18, 2021, Mazza provided the firearms serial number to the Shelbyville Police Department, and it was entered on the same day into the NCIC database as having been reported stolen on January 6, 2021.  The serial number matched the serial number of the Taurus Revolver dropped by S-1 and recovered at the U.S. Capitol on January 6, 2021.

49.     Further criminal investigation confirmed Mazza's cell phone was an Apple iPhone with cellular provider AT&T, with the same mobile telephone number that Mazza used to report

the theft of the Taurus Revolver.  Mazza's subscriber records further confirmed the same address as Mazza's Residence.  Based on driver's license information, and the most recent DMV picture of Mazza from 2017, Mazza is a white male, 56 years old, with short brown hair, and brown/white goatee.  Mazza was further identified as having a residence in Shelbyville, IN with the same address as the TARGET LOCATION.

50.     A photo array containing nine (9) photos, one being the above described DMV photo of Mazza, was presented to CW-1 on January 28, 2021, to identify S-1.  Upon presentation of the array CW-1 was told the pictures of the individuals may appear different than they may be in real life and may include different facial hair or color hair.  The driver's license photograph shows Mazza as a white male, approximately 56 years old, with a goatee, brown/white facial hair, and was taken approximately in 2017.   The image of Mazza used in the array is as follows:



CW-1 did not identify Mazza from the nine (9) photos, but looked closely at one photo (S-2), not Mazza, who is a white male, approximately 37 years old, and had a full beard, red / brown in color.   S-2's picture in the array was:



CW-1 indicated that other person "looks very close to what I can recall," and "I want to say this guy because he was wearing a hat. I will stick to this guy." CW-1 was asked if he was positive, and he stated that he was not. CW-1 further stated, "It's real fricking hard, he had this look."

51.    In February 2021, a search warrant was obtained for records for the telephone number that Mazza used to report the Taurus Revolver stolen. The search warrant was directed to AT&T and requested, among things, geolocation information. Records supplied by AT&T pursuant to the search warrant confirmed that the phone that Mazza owned and used was an Apple 7 iPhone with an International Mobile Equipment Identity (IMEI) that starts with 355342088528. A review of the cell towers used by Mazza's phone on January 6, 2021, further confirmed that Mazza's phone was utilizing cell towers providing service in the area around the United States Capitol at the time of attack on the U.S. Capitol. The records also indicate that Mazza's phone was present in Ohio on January 5, 2021, and other states that indicate that Mazza traveled to Washington, D.C. on January 6, 2021, and then returned to Indiana shortly thereafter. These

records confirm that Mazza was in Washington, D.C. on January 6, 2021, which is contrary to Mazza's statement to the Shelbyville Police Department when he reported his Taurus Revolver stolen.

52.     Further online investigation led to the discovery of a Twitter account with the user name "@MarkNunzios64" and the display name "Mark Mazza" at https://twitter.com/marknunzios64.   Also discovered was a Facebook account at https://www.facebook.com/markMazza1964.   Subpoenas to Twitter and Facebook revealed Mazza supplied both platforms his iPhone's telephone number and his email address.

53.     During a review of materials on the public feed of Mazza's Twitter account, your affiant observed a video that your affiant is aware was taken during the riot on January 6, 2021, from the area of the upper west Terrace of the U.S. Capitol Building, and area restricted to authorized persons only on January 6, 2021.   The video depicted protesters entering the U.S. Capitol Building through a broken window on the west side Terrace of the U.S. Capitol.   Screen shots of that video are as follows:



mark mazza
@MarkNunzios64

Replying to @Truth_Gazette @DonaldJTrumpJr and 2 others



0:08  45 views

7:40 PM · Jan 6, 2021 · Twitter for iPhone



54.    A search warrant for the Twitter account confirmed that Mazza uploaded the above video to his own Twitter account.  Specifically, the video was shared using "Twitter for iPhone" application that I know to be used on the Apple iPhone.  Cell tower records placing Mazza's phone near the U.S. Capitol on January 6, 2021, are consistent with my conclusion that Mazza was filming the events live at that time and location, and posting those videos to Twitter, using his Apple iPhone.  Also found on the Twitter account were a number of self-portraits, commonly

known as "selfies," that appear to have been taken by Mazza on January 6, 2021.  One of the images is as follows:



55.     On or about March 25, 2021, your affiant and a Supervisory Special Agent from the U.S. Capitol Police (SSA) traveled to Shelbyville, IN, to attempt to conduct a non-custodial interview of Mazza at his home.   Your affiant also obtained a search warrant to obtain and search Mazza's cellular phone from Mazza's person and/or his residence.  On March 29, 2021, your affiant and the SSA went to Mazza's residence (Target Location) and encountered Mazza outside his residence.  As the SSA and I approached Mazza, we identified ourselves as United States Capitol Police investigators, to which Mazza replied, "Capitol Police... I was there... so were a

million other people." Your affiant informed Mazza about the search warrant for his property and asked to speak to him as the search warrant was being executed. Mazza agreed to speak to us if the interview took place on the front porch of his residence. Mazza was not taken in custody, handcuffed, or otherwise physically restrained during the interview.

56.     Mazza was advised during the interview that he did not have to speak with myself or the SSA, and that the interview was completely voluntary. He was further warned not to make any false statements or "lie." The interview commenced at 4:28 P.M., and was audio recorded with a handheld recorder.   Mazza was asked to describe how his firearm was stolen and he replied "uhhh… do you want the official version?" and "I had it on me and I had stopped the crowd, ok, they were trying to get in. I don't even know what entrance that is… you got the main entrance… the other side."   Mazza further stated "that's where we all went… we were all there up on top everywhere." Mazza was asked to clarify what he meant by "where" and replied "the Capitol."

57.     During the interview Mazza indicated he participated in the "Stop the Steal" Rally, and he went on to describe that when he got to the U.S. Capitol building, that there was a window broken out on the side of the entrance, a line of people trying to force their way in the entrance, and other people trying to break another window. Mazza stated, "We kept trying to pull them back down… we didn't want any of that."

58.     Mazza further stated that he got to the "hallway," which was where everyone was getting pepper sprayed. Mazza stated "I go in the hallway because this is bullshit, what are we trying to do?" Mazza added, "Me and my buddy said, 'what are they doing here?'… We knew it was Antifa because we are law abiding citizens, we don't do that… we don't loot."  Mazza went on to state that he "got up there," that there were two glass doors open and eight cops with protestors.  Mazza claimed to have stopped both sides and announced to the crowd, "What the hell

23

are we doing? You're not gonna let us in and they said no… And you guys… what do you want? We're not gonna hurt anybody. We're not here for that."   Mazza then claimed that he, "had this door in my hand, I looked at the cop, I was getting ready to shut the door because there was another guy holding this one with his foot." Mazza stated that he looked up and saw a cop who raised his bear spay prompting Mazza to say, "I'm out!" Mazza claimed to jump behind the door as everyone else got sprayed.   Mazza stated that he was "caught…smashed into the door, I'm assuming it was a shoulder holster… the snap… I felt it come undone and I couldn't get my hands down." Mazza added, "By the time I was forced out of the tunnel, it was gone."   Mazza asked, "What am I gonna do? I couldn't get back in there… the police had pushed their way out, and I thought, well then they just picked it up." Mazza continued, "I was hoping… someone saw it and said we gotta get that now."   Mazza was asked what type of firearm he brought, and he replied, "Taurus Judge, it was a cammo with 45 long and 410 slugs."

59.     Mazza stated that he reported the gun stolen because in case something happened and if Antifa found it, someone might get killed and my name is all over it. Mazza further stated, "I did falsify a report…It's missing, not stolen."   Mazza was asked, "When you were at D.C., did you at any time assault any police officers?" Mazza replied, "No. In fact… I helped two of them." Mazza described helping a white officer with a beard and a black officer, both who had been dragged out, and were being passed along. Mazza claimed to have grabbed both of the officers and assisted in getting them out of there.   Mazza was asked again, after being warned of multiple cameras, "Did you at any point grab, push, shove, pull down a police officer?" Mazza replied that he grabbed multiple people, including two cops, to get them out of there. Mazza stated, "No, I did not injure anyone… didn't swing, didn't do nothing. I can barely make a fist because of my

arthritis. I never injured any police officer or anyone… period."  Mazza was asked if had looked up the firearms laws prior to traveling to D.C. and he replied that he did not.

60.     Mazza was asked, "Is there anything you told us that you want to change or add to?"  Mazza replied, "It was cold as hell that day, that whole three days… never did get to talk to Nancy… I thought Nan and I would hit it off." Mazza continued, "I was glad I didn't because you'd be here for another reason and I told my kids that if they show up, I'm surrendering, nope they can have me, because I may go down as a hero." Mazza then added "I'm nonviolent, I'm a patriot and it pisses me off to see where we're at."  Mazza further stated that, "If you do have to come back and take me, put me in a fed… I just want three squares and a nice clean room, someone takes care of my healthcare and I'm good."

61.     A review of available video footage, from law enforcement and social media, was conducted to identify Mazza and verify his claims.  Your affiant has reviewed the video and identified Mazza in U.S. Capitol Police security camera moving through the crowd and entering the tunnel to the Lower West Terrace doors at approximately 3:08:29 p.m.  During his initial appearance in the video, Mazza is wearing a brown jacket, a blue and red "Trump" hat, and white and dark colored scarf over his face.  This clothing in the video further matches the selfie photograph of Mazza from January 6, 2021, found on his social media account.  As Mazza moves through the tunnel area, his scarf drops, and his face is visible at numerous parts of the video.  I am able to identify Mazza based upon my own personal familiarity with Mazza.  SSA further reviewed the video and identified Mazza based on his familiarity with Mazza.  The area covered by the video footage is also consistent with the area that Mazza stated he went to during the attack on the U.S. Capitol Riot.

62.     The video footage from the Lower West Terrace Doors shows that numerous persons were assaulting officers at the front of the tunnel space, when Mazza appears into the tunnel behind them.  Images from the video footage include the following (with red circle added to show Mazza's location):





Mazza is then observed assisting the group of protesters by pushing with others from behind, the group as a whole, towards D.C. Metropolitan Police Department Officers (MPD Officers) who were assisting the U.S. Capitol Police and defending the Lower West Terrance door entrance to the U.S. Capitol.   The MPD Officers were wearing helmets, body armor, and distinctive police attire emblazoned with the words "police" and "Metropolitan Police Department."  At least 15 MPD Officers were assisting in blocking the attack inside the tunnel at the time of Mazza's presence inside the tunnel area, and included: Sergeant W.B., Officer M.F., Officer N.M., Officer H.F., Officer J.P., Officer D.H., and Officer B.M.

Images of Mazza assisting the pushing against officers is in the following images:





63.      The Lower West Terrace security footage shows that Mazza continued to the front

of the tunnel area with a baton in his hand, where he and others, assaulted the MPD Officers who

were defending the front of the tunnel.  A review of Body Worn camera (BWC) footage from multiple MPD Officers who were defending the inside of the Lower West Terrace doors at approximately 3:13:30 p.m. shows Mazza behind one of the glass doors.  Mazza can be seen holding the glass doors open for other protesters with his right hand while clenching a black baton in his hand.  As he held open the glass door, other rioters assaulted the MPD Officers who were defending the tunnel entrance and resisting the protestors.  In one video from and in the MPD BWC, Mazza is seen at this same moment while he is holding the glass door open as rioters used shields, flag poles, and batons as weapons to strike at and force their way through the MPD officers. Images from one of the public videos include:



Mazza's hand is shown below holding open the door as other rioters pushed forward to assault multiple MPD Officers:



64.     Additional BWC footage from another DC metropolitan Police Officer revealed

Mazza actively swinging the baton at police officers @ approximately 3:15:45 p.m.





65.     At approximately 3:13:58 p.m., Mazza is also observed and recorded on multiple

videos as yelling at the officers, "This is our fucking house! We own this house! We want our

house!"   Images from one of the videos is as follows:





66.    Shortly thereafter, Mazza is seen moving from the front of the tunnel, where he had

committed and witnessed violence against the MPD Officers, to the back of the tunnel area.  There

Mazza showed other rioters his baton and pulled other rioters into the tunnel area to attack and

push against the MPD Officers at the front of the tunnel, as many of the rioters yelled "heave-ho!" These "heave-ho" efforts - by which multiple rioters collectively used their body mass for greater force in pushing back officers, gaining momentum by leaning back and then pushing forward in unison while chanting "heave-ho" to coordinate their efforts - resulted in significant physical force and pressure being placed upon the MPD Officers at the front of the tunnel.  While engaged in the "heave-ho" efforts, Mazza was armed with the baton.  An image from the video that shows Mazza displaying the expandable baton for other rioters is below.



Images showing Mazza pulling people into the tunnel area to assist it in the assault on MPD Officers shortly thereafter include the following:





Images of the video showing Mazza pushing with the group yelling "heave-ho" while armed with a baton include the following:





67.     Other images from the video showing Mazza inside the tunnel area without a covering over his face include the following:





68.     Several minutes after enduring multiple "heave-ho" pushes from the rioters MPD Officers moved forward to push the attackers from inside the tunnel area.  As they did so, MPD Officers M.F. and M.M. were dragged into the crowd, assaulted and beaten.  Some rioters eventually helped Officer M.F. back to the line of police officers, and Officer M.M. to escape from the specific area.  Video footage from the area indicates that Mazza had his baton extended in his hand and was near Officers M.F. and M.M. as they were being pulled into the crowd.  The video footage reviewed does not show that Mazza assaulted either officer with the baton but suggests he may have attempted to thwart other rioters from attacking the officers.

69.     Based on the above images and Mazza's interview, during his actions on January 6, 2021, Mazza was wearing metallic colored glasses (that appear to have an auto tinting feature), a red, white and blue Trump hat, a white and dark colored scarf, tan pants, a tan jacket, a dark colored sweatshirt with markings on left and right side front, and a shoulder holster, and he was armed with a collapsible dark colored baton and at least one firearm, that being the Taurus Revolver (which he dropped at the scene) which was loaded with shotgun and hollow point cartridges.  Additionally, persons involved in the assault at the U.S. Capitol stole and took property belonging to the United States government, including helmets, riot gear, shields gas masks, and other property from inside the United States Capitol.  This warrant authorizes seizure of any such material found in the Target Location.

## CONCLUSION

70.     I submit that this affidavit supports probable cause that Mazza has committed the Subject Offenses and that the TARGET LOCATION described in Attachment A contains evidence, fruits and instrumentalities of Mazza's violations of the Subject Offenses, including, but not limited to clothing Mazza wore on January 6, 2021, and all firearms, ammunition, and gun paraphernalia.   It is respectfully requested that the court issue a search warrant to search the TARGET LOCATION described in Attachment A, and seize the items described in Attachment B.

Respectfully Submitted,

_____

Richard T. Larity
Special Agent, United States Capitol Police


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3),by telephone, on this 16th day of November, 2021.


_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

40

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** 314 SHELBY STREET, SHELBYVILLE, INDIANA UNDER RULE 41 | **SW No. 21-sw-391** **Filed Under Seal** |

## APPLICATION TO ISSUE AND SEAL SEARCH WARRANT UNDER RULE 41(B)(3), AFFIDAVIT IN SUPPORT, AND MEMORANDUM IN SUPPORT THEREOF

The United States of America, by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order issuing a warrant under Federal Rule of Criminal Procedure 41(b)(3) and placing the above-captioned search warrant, and the application and affidavit in support thereof, and all attachments thereto and other related materials such as this application and order (collectively, the "Warrant") under seal until further order of the Court. The physical property above is located in the Southern District of Indiana. Nevertheless, venue exists in the District of Columbia for a magistrate judge to issue a warrant in connection with this property under Rule 41(b)(3) because the warrant relates to an investigation of domestic terrorism that occurred in this district. Judge Zia Faruqui has previously authorized a physical search warrant in this investigation -- that being the investigation into those were involved in the assault on the U.S. Capitol on January 6, 2021-- under Rule 41(b)(3) after the government provided legal briefing on the issue. *See In re the Matter of the Search of One Apple iPhone Under Rule 41*, 21-SW-253 (ZMF). The government here in adopts the same argument provided therein.

## EXPANDED VENUE UNDER RULE 41(B)(3)

### A.      Legal standard and definitions.

To consider and issue the requested search warrant, this Court must assure itself that Rule 41(b)'s venue provision is satisfied. Under Rule 41(b), "venue" confers "jurisdiction" to issue a

search warrant.  *See United States v. Thorne*, No. CR 18-389 (BAH), 2021 WL 2682631, at *41 & n.16 (D.D.C. June 30, 2021) (noting that some courts have found that lack of "venue" under Rule 41(b) means that the magistrate judge lacked "jurisdiction" to issue the warrant in the first place).  The Court must find that Rule 41(b)'s venue provision is satisfied pursuant to a "reason to believe" standard.  *See id.* at *30 (holding that a "reason to believe" standard, rather than probable cause or actual knowledge, is the venue standard under Rule 41(b)(2)).[1]

Because this warrant relates to an investigation of domestic terrorism, this Court has jurisdiction to issue it under Rule 41(b)(3), which provides:

> Venue for a Warrant Application. At the request of a federal law enforcement officer or an attorney for the government: . . . a magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district.

According to Rule 41(a)(2)(D), the phrase "domestic terrorism" in Rule 41(b)(3) has the same definition as in 18 U.S.C. § 2331(5), which defines "domestic terrorism" as:

> activities that—
>
> (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i)     to intimidate or coerce a civil population;
>> (ii)    to influence the policy of a government by intimidation or coercion; or
>> (iii)   to affect the conduct a government by mass destruction, assassination, or kidnapping; and

---

[1] The government respectfully submits that the instant application also satisfies the higher standard of probable cause.

(C) occur primarily within the territorial jurisdiction of the United States.

**B.**     **Under Rule 41(b)(3), the proper inquiry focuses on the *investigation* rather than the specific offenses for which evidence is sought.**

Under the plain terms of Rule 41(b)(3), to assure itself that it has jurisdiction to consider and issue a warrant, the Court must determine whether there is reason to believe that the warrant relates to a domestic terrorism investigation.   As explained below, the proposed warrant for the property does so.

The Court need not—and should not—engage in an analysis to determine whether each predicate offense for which the warrant establishes probable cause qualifies as "domestic terrorism" or constitutes a "*crime* of terrorism."   The operative inquiry is whether the warrant seeks evidence in a terrorism *investigation*.

The plain language of Rule 41(b)(3) thus demonstrates that the relevant inquiry is whether the warrant relates to an investigation of terrorism, rather than whether a particular predicate offense satisfies a particular definition.   This conclusion is buttressed by the structure of Rule 41, the structure of subsection (b) of the Rule, other courts' interpretations, and legislative history.

### 1.    The plain language of Rule 41(b)(3) focuses on the *investigation*.

Rule 41(b)(3) provides venue to a magistrate judge "in an investigation of . . . terrorism" (so long as any "activit[y] related to the terrorism" occurred in the magistrate judge's district). The Rule is not offense-specific.

Rule 41(a)(2)(D), which defines the phrase "domestic terrorism" by reference to Section 2331(5), encompasses "activities" rather than specified crimes.   And Rule 41(b)(3) refers to "investigation" of those "activities."   In other words, when the government seeks evidence in a terrorism investigation and there is reason to believe that the property to be searched contains

3

evidence of criminal "activities related to the terrorism," Fed. R. Crim. P. 41(b)(3), nothing in these provisions requires or authorizes the magistrate judge to limit the warrant to search for evidence of certain specific crimes.

Indeed, Rule 41 conspicuously does *not* reference the section of the U.S. Code that defines "[f]ederal *crime* of terrorism," 18 U.S.C. § 2332b(g)(5) (emphasis added).[2]   And other sections of the U.S. Code make clear that Congress knew how to refer to a broad *act* of terrorism without reference to a specific *crime* of terrorism.   *See, e.g.*, 18 U.S.C. § 226 (criminalizing bribery with "intent to commit . . . terrorism" as defined in Section 2331); 18 U.S.C. § 1505 (enhancing penalty for obstruction of proceedings if the "offense involves . . . terrorism" as defined in Section 2331); 18 U.S.C. § 1425 (enhancing penalty for unlawfully procuring citizenship "if the offense was committed to facilitate an act of international terrorism" as defined in Section 2331); *see also* 18 U.S.C. § 981(a)(1)(G) (in different subsections of civil forfeiture statute, cross-referencing as appropriate a "crime of terrorism" under Section 2332b(g)(5) or "any act of international terrorism" under Section 2331).

Like with these statutes, when Congress enacted Rule 41(b)(3) it made clear that the triggering language was the *act* of terrorism (and here, the *investigation* into those *acts*) rather than a specific *crime* of terrorism.

    **2.   The structure of Rule 41 indicates that section (b) provides a preliminary step to ensure the magistrate judge has jurisdiction to issue the warrant.**

---

[2] One of the predicate offenses in the search warrant—18 U.S.C. § 1361 (destruction of government property)—is, in this circumstance, a "[f]ederal crime of terrorism," because it was "calculated to influence or affect the conduct of government by intimidation or coercion," 18 U.S.C. § 2332b(g)(5)(A), and it is enumerated under 18 U.S.C. § 2332b(g)(5)(B)(i).

The sections of Rule 41 set forth in logical, chronological fashion the procedure for issuing a warrant.   The Rule first explains who can issue a warrant and in what circumstances (sections (b) and (c)), then how the warrant is issued and executed (sections (d), (e), and (f)), and finally what to do with the warrant and the evidence after the seizure (sections (g), (h), and (i)).

Section (b) is therefore the first step in the process, and it ensures that the magistrate judge has jurisdiction to consider the warrant.   Section (b) is not limited by the remaining sections of Rule 41.   To the contrary, once a magistrate judge determines that she has jurisdiction to consider and issue the warrant—pursuant to one of the subsections of section (b), as described below—there are no further limitations on the authority of the magistrate judge related to her jurisdiction or the type of offense under investigation.

### 3.   The structure of Rule 41(b) indicates that subsection (b)(3) is expansive.

Section (b) provides a magistrate judge with jurisdiction to issue a warrant if certain prerequisites are met.   The first, and most common, is contained in subsection (b)(1), which grants a magistrate judge jurisdiction to issue a warrant if the physical property or person is physically located within the judicial district.   Chief Judge Howell's recent decision in *Thorne*, 2021 WL 2682631, at *30, explained that subsection (b)(1) provides a magistrate judge with territorial jurisdiction, and that subsections (b)(2) through (b)(6) are best read as exceptions to territorial jurisdiction.

Subsections (b)(2) through (b)(6) *expand* the magistrate judge's jurisdiction, granting her the authority to issue warrants to search and seize property and persons who may be physically located outside the judicial district.   Subsection (b)(2) allows a magistrate judge to issue a warrant for property or a person even if the property or person might be moved outside the district before

5

the warrant is executed, and subsection (b)(4) similarly allows a magistrate judge to issue a warrant to install a tracking device within the district even if the device is then moved out of the district. Subsection (b)(5) provides a magistrate judge with jurisdiction to issue a warrant for property located outside the legal jurisdiction of any state or district. And subsection (b)(6) grants a magistrate judge jurisdiction to issue a warrant for remote access to search electronic storage media and seize or copy electronically stored information, even if the media is stored outside the judge's district.

Similar to its sister subsections, subsection (b)(3) *expands* the magistrate judge's typical territorial jurisdiction, giving her the authority to issue warrants to search and seize property and persons who are physically located outside the judicial district so long as the warrant seeks evidence in an investigation of terrorism. By its plain terms, under Rule 41(b)(3), "in *investigations* of domestic terrorism" (emphasis added), a magistrate judge has authority to issue warrants for property located outside the district provided that "activities related to the terrorism may have occurred" within the district. Rule 41(b)(3) is not cabined to evidence of specific predicate *offenses* but rather provides jurisdiction for out-of-district property in terrorism *investigations*. There is no limit in Rule 41(b)(3)—or, indeed, in any of the other Rule 41(b) subsections—on a magistrate judge's authority with respect to the offenses under investigation or the types of items or information that a warrant may seek.

Put differently, subsections (b)(1) and (b)(3) vest magistrate judges with venue in different ways. Subsection (b)(1), the usual territorial venue provision, vests a magistrate judge with jurisdiction to issue a warrant if the object of the warrant is physically located in the same judicial district. Subsection (b)(3) vests a magistrate judge with jurisdiction to issue a warrant, regardless

of the physical location of the item, if the magistrate judge is sitting in a judicial district in which "activities related to the terrorism may have occurred."

Simply, under subsection (b)(3), a magistrate judge's jurisdiction may be satisfied by the location of the *activities* rather than the location of the *evidence*.

### 4.  Judicial decisions support a broad reading of Rule 41(b)(3) to effectuate its purpose.

Instructively, two courts have issued written decisions addressing Rule 41(b)(3), and both support an expansive reading of the magistrate judge's jurisdiction.  In addition, Chief Judge Howell's recent decision in a case involving Rule 41(b)(2) similarly supports an expansive interpretation of subsection (b)(3).

In *United States v. Muhtorov*, No. 12-CR-00033-JLK, 2017 WL 11367940, at *1 (D. Colo. May 11, 2017), a magistrate judge in Colorado, pursuant to the authority granted by Rule 41(b)(3), issued warrants for a person and certain property located in Pennsylvania.  The defendant later moved to suppress evidence obtained when the warrants were executed in Pennsylvania, calling the warrants "illegal, extra-territorial" warrants.  *Id.*  The district judge rejected the argument, holding that "Rule 41(b)(3) articulates the magistrate's authority in terrorism cases, providing her with authority to issue warrants outside her district as long as activities 'related' to terrorism 'may' have occurred in her own."  *Id.* at *2.  The court did not identify any limitation on the types of evidence that may be sought under Rule 41(b)(3), or the specific offenses that must be under investigation.  Rather, because the affidavit provided probable cause to believe that "activities related to . . .  terrorism may have occurred" in Colorado, under Rule 41(b)(3) the magistrate judge "had geographic authority to issue the . . . search-and-seizure warrants" for property physically located in Pennsylvania.  *Id.*

7

In *In re Search Warrant*, 362 F. Supp. 2d 1298, 1301 (M.D. Fla. 2003), a magistrate judge, in holding that 18 U.S.C. § 2703 did not confer jurisdiction to issue a warrant for out-of-district property in a child pornography investigation, examined the text and legislative history of Rule 41(b)(3) to contrast it with Section 2703.   According to the magistrate judge, while Section 2703 was narrow, Rule 41(b)(3) was broad: "there is no doubt that [Congress's enactment of Rule 41(b)(3)] extended this Court's authority to issue warrants to search and seize electronic communications outside the district in terrorism cases." *Id*. at 1303.   While a district judge later held that the magistrate judge did in fact have jurisdiction under Section 2703, *In re Search Warrant*, No. 6:05MC168ORL31JGG, 2005 WL 3844032, at *4 (M.D. Fla. Feb. 13, 2006), the district judge did not disturb the magistrate judge's dicta regarding Rule 41(b)(3).   In fact, both judges expounded on the reasons for Congress's passage of Rule 41(b)(3): to allow a magistrate judge, in a terrorism investigation, to move quickly and efficiently in issuing a search warrant for out-of-district property.   Neither judge suggested that the magistrate judge's jurisdiction was limited to searches and seizures of evidence of terrorism *offenses* under Rule 41(b)(3) and both determined that magistrate judges were granted broad authority to issue warrants for out-of-district property in terrorism *investigations* or *cases*.

Chief Judge Howell's decision in *Thorne* similarly supports an expansive interpretation of subsection (b)(3).   In the context of cell-site simulators, the court recognized that an "overly stringent interpretation of Rule 41(b)(2) . . . though consistent with the plain text of the Rule, would . . . produce unreasonable outcomes and stymie law enforcement."   2021 WL 2682631, at *32. "The Fourth Amendment is silent as to the proper venue for seeking a search warrant, and its constitutional threshold for the substantive warrant requirement of probable cause is therefore not

automatically applicable to a determination of venue under Rule 41(b)(2)."  *Id.* at *37.   At

bottom, Chief Judge Howell emphasized that "the background principles animating a particular

Rule" should "inform a court's approach to construing its text," and therefore the venue provision

in Rule 41(b) should be read broadly to be consistent with Congress's intent to account for the

practical and realistic needs of law enforcement.  *Id.* at *34.

Each court therefore recognized Congress's intent to grant magistrate judges broad

jurisdictional authority in terrorism investigations to issue search warrants for property physically

located outside their districts.

### 5. The legislative history of Rule 41(b)(3) confirms that Congress intended to provide magistrate judges with expansive jurisdiction in terrorism investigations.

Rule 41(b)(3)'s legislative history further supports a conclusion that a warrant need not be

limited to seeking evidence of terrorism offenses.   In 2001, with the passage of the USA

PATRIOT Act, Congress amended Rule 41 by

> inserting after "executed" the following: "and (3) in an investigation of domestic terrorism or international terrorism (as defined in section 2331 of title 18, United States Code), by a Federal magistrate judge in any district in which activities related to the terrorism may have occurred, for a search of property or for a person within or outside the district."

Pub. L. 107–56, 115 Stat. 272, § 219 (Oct. 26, 2001).   Indeed, the title of Section 219 of the USA

PATRIOT Act is "Single-Jurisdiction Search Warrants for Terrorism," evidencing Congress's

intent that, in terrorism investigations, the government should have the option of bringing warrant

applications to a single magistrate judge, even for evidence and property located outside the

district.   Congress's authorization to magistrate judges in terrorism investigations is broad and

clear: Congress expanded magistrate judges' jurisdiction to extraterritorial warrants involving

9

terrorism—period.   Congress imposed no restriction over the specific crimes for which there exists probable cause.   Congress recognized that Rule 41(b)'s typical requirement "that a search warrant be obtained within the judicial district where the property to be searched is located . . . causes unnecessary delays and burdens law enforcement officers investigating terrorist activities that have occurred across multiple judicial districts."   House Committee on the Judiciary, *Report on USA PATRIOT Act of 2001 to Accompany H.R. 2975*, Rept. 107-236, Part 1, at p.72 (Oct. 11, 2002).   Appreciating that "delays can have serious adverse consequences on an ongoing terrorism investigation," Congress amended Rule 41(b) "to provide that in an investigation of domestic or international terrorism a search warrant can be obtained in any district court of the United States . . . having jurisdiction over the offense being investigated."   *Id.*

The intended purpose of Rule 41(b)(3) is therefore to ensure investigative efficiency and expediency in terrorism investigations.   Limiting the provision to confer jurisdiction only over warrants seeking evidence of specific predicate terrorism offenses would frustrate that objective. Terrorist activities commonly involve multiple overlapping crimes, which are not themselves "terrorism offenses," such as obstructing justice, money laundering, or conspiracy to defraud. Requiring law enforcement to seek multiple search warrants in various districts depending on where the property is located and to which predicate offense the evidence pertains is the precise inefficiency the USA PATRIOT Act sought to remedy.   In the wake of the September 11 terrorist attack, Congress did not intend for investigating law enforcement agents to have to seek multiple warrants in multiple jurisdictions based on the location of predicate offenses within the U.S. Code—rather, Congress intended to consolidate warrant applications in a single jurisdiction to

enable law enforcement the swift ability to obtain a magistrate judge's approval to lawfully seize evidence related to terrorism investigations.

### C.     Venue is proper under Rule 41(b)(3) in the instant matter.

The instant search warrant establishes probable cause to believe that certain specified offenses were committed, probable cause to believe that the property will contain evidence relating to those offenses, and reason to believe that the warrant relates to an investigation of domestic terrorism.

The instant search warrant application is related to the government's investigation of the events on January 6, 2021, when a violent mob stormed the U.S. Capitol while a Joint Session of the U.S. House of Representatives and the U.S. Senate were convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.   The investigation of the January 6 attack constitutes a domestic terrorism investigation as defined by Section 2331(5).   First, as has been well documented, the events of January 6 tragically "involve[d] acts dangerous to human life" that were "a violation of the criminal laws of the United States or of any State."   18 U.S.C. § 2331(5)(A).   Indeed, the government has charged over 550 people with violations of federal law in connection with the events of January 6 and over 150 people with assaulting or impeding law enforcement.   These charges include violations of 18 U.S.C. §§ 111(a) and (b) (assaulting, resisting, or impeding certain officers using a dangerous weapon and inflicting bodily injury); 1752 (a)(1), (2) and (b)(1)(A) (entering and remaining in a restricted building or grounds with a deadly or dangerous weapon and engaging in physical violence); and 18 U.S.C. § 5104(c)(2)(F) (violent entry and disorderly conduct in a capitol building).   The violence and danger to human life posed by the actions that day is uncontroverted.

Likewise, the actions on January 6 "appear[ed] to be intended"—and in fact did—"influence the policy of a government by intimidation or coercion."   At 2:20 p.m., members of the House and Senate (including Vice President Pence) were evacuated from their respective chambers.   The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law enforcement officers worked to restore order and clear the Capitol of the unlawful occupants.   As this Court has recognized, many of the individuals who comprised the violent mob sought to "create[ ] mayhem on Capitol grounds and interfere[e] with the Capitol Police, all in furtherance of the goal of disrupting Congress's fulfillment of its constitutional duty to certify the vote count of the Electoral College and thus interfering with—or even preventing—the peaceful transition of power."   *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *9 (D.D.C. Feb. 26, 2021); *see also United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) ("[H]undreds . . . took over the United States Capitol; caused the Vice President of the United States, the Congress, and their staffs to flee . . . ; engaged in violent attacks on law enforcement officers . . . and delayed the solemn process of certifying a presidential election. This was a singular and chilling event in U.S. history . . . .").

As the Court is aware, certain members of the mob that descended on the U.S. Capitol on January 6, 2021 were armed, and they engaged in conduct dangerous to human life and intended to influence the policy of a government by intimidation or coercion.   As described in the affidavit and referenced above, on January 6, 2021, the target, Mark Andrew Mazza, ("Mazza"), traveled across state lines while armed with a special revolver that could fire shotgun shells and regular cartridges.   Mazza armed the firearm with shotgun shells and hollow-point bullets and participated in the riot on January 6, 2021.   Mazza lost the firearm during the assault, but later

armed himself with a collapsible baton in a tunnel pathway leading to the West Front Terrace door of the U.S. Capitol.   Mazza himself, along with dozens of others physically assaulted thee law enforcement officers who were pushing back the insurgents: Mazza swung the collapsible baton at the officers and yelled, "This is our fucking house!   We own this house!   We want our house!" On January 6, 2021, Mazza also aided and abetted dozens of other rioters who were physically assaulting the same officers: he did this by holding open the door to the U.S. Capitol while others directly assaulted numerous law enforcement officers with weapons and their bodies, and by participating in collective pushing by the rioters against the officers while yelling "heave-ho!" Several law enforcement officers were injured during this activity.

After January 6, 2021, Mazza obstructed justice by filing a false police report for the weapon that he lost at the U.S. Capitol and claimed the firearm was stolen from his car in a casino parking lot in Ohio.   Mazza further provided false information to law enforcement officers who interviewed him about his conduct on January 6, 2021, where he lied about being involved in any violence or assaultive conduct towards law enforcement.

\* \* \* \*

Accordingly, the investigation into the attack on the United States Capitol on January 6, which encompasses conduct by Mazza and others (including members of the Oath Keepers and their associates), is a domestic terrorism investigation under Section 2331(5) because the conduct under investigation includes criminal acts dangerous to human life that were intended to influence the policy of the United States government by intimidation or coercion.   As the attack on the Capitol occurred in Washington, D.C., a magistrate judge in this judicial district "has authority to

issue a warrant for a person or property within *or outside* th[e] district."   Fed. R. Crim. P. 41(b)(3) (emphasis added).

## LEGAL BACKGROUND FOR SEALING

The Court has the inherent power to seal court filings when appropriate, including the Warrant.   *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)).   *See also*, *e.g.*, *In re Sealed Affidavit(s) to Search Warrants*, 600 F.2d 1256, 1257 (9th Cir. 1979) (finding that the court has inherent power to seal search warrant affidavits).   Such sealing is within the discretion of the District Court.   *See Nixon*, 435 U.S. at 598 (common-law right to inspect and copy judicial records is not absolute, but the decision whether to permit access is best left to the sound discretion of the trial court in the light of the relevant facts and circumstances of the particular case).

More particularly, the Court may seal the Warrant and related filings to prevent serious jeopardy to an ongoing criminal investigation when, as in the present case, such jeopardy creates a compelling governmental interest in preserving the confidentiality of the Warrant.   *See Washington Post v. Robinson*, 935 F.2d 282, 287-89 (D.C. Cir. 1991).

Courts have traditionally been "highly deferential to the government's determination that a given investigation requires secrecy and that warrant materials be kept under seal."   *Times Mirror Co. v. United States*, 873 F.2d 1210, 1214 (9th Cir. 1989).   Therefore, courts have routinely granted government requests to seal warrant materials where there is a need for secrecy. *Id.*; *see also id*. at 1215, 1219 n.13 (Sealed search warrant materials have been treated as the functional equivalent of grand jury materials in their shared need for secrecy.).   While courts may disagree whether there even exists a qualified right under the common law or the First Amendment

14

to access to sealed search warrant materials,[3] courts are in general agreement that a movant is not entitled to access to sealed search warrant materials if disclosure would compromise an ongoing investigation or endanger witnesses.  *See*, *e.g.*, *id.* at 1212-1221 ("warrant proceedings and materials should not be accessible to the public, at least while a pre-indictment investigation is still ongoing"); *Baltimore Sun Co.*, 886 F.2d at 64 ("the need for sealing affidavits may remain after execution and in some cases even indictment"); *In re Search Warrants for National Builder Corp.*, 833 F. Supp 644, 645-646 (N.D. Ohio 1993) (grand jury target was not entitled to the unsealing of a search warrant affidavit if it would compromise an ongoing investigation).

## REQUEST FOR SEALING

Such an Order is appropriate because the Warrant relates to an ongoing criminal investigation that is neither public nor known to the subject(s) of the investigation.   In particular, an Arrest Warrant (which is under seal) has been issued for Mazza, and the nature and scope of evidence available to law enforcement, as set forth in the search warrant affidavit, is neither public nor known to the subject(s) of the investigation.   Accordingly, disclosure may reveal the existence, scope, and direction of the Government's ongoing and confidential investigation.   Once alerted to the investigation and the scope of such evidence available to law enforcement, potential subject(s) could be immediately prompted to flee from prosecution, destroy or conceal incriminating evidence, alter their operational tactics to avoid future detection, attempt to influence

---

[3]  *See*, *e.g.*, *Times Mirror Co.*, 873 F.2d at 1212-1221 (no right of access to sealed search warrant materials exists under the First Amendment, the common law, or Fed. R. Crim. P. 41(g)); *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989) (no First Amendment right of access, but qualified common law right of access); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988) (qualified First Amendment right of access).

or intimidate potential witnesses, and otherwise take steps to undermine the investigation and avoid future prosecution.   In particular, given that they are known to use electronic communication and remote computing services, the potential subject(s) could quickly and easily destroy or encrypt digital evidence relating to their criminal activity.   Further, notification could also result in the subject(s) avoiding travel to the United States or other countries from which they may be extradited.

Therefore, based on the foregoing, there are reasonable grounds to believe that disclosure of the Warrant and the details in the search warrant affidavit would result in flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to this investigation.   *Cf.* 18 U.S.C. § 2705(b)(2)-(5). In short, because of such potential jeopardy to the investigation, there exists a compelling governmental interest in confidentiality to justify the sealing the Warrant, this application, and this Order.   *See Robinson*, 935 F.2d at 287-89.

ACCORDINGLY, it is respectfully requested that the above-captioned warrant be issued pursuant to Rule 41(b)(3), and that the application and affidavit in support thereof, and all attachments thereto and other related materials (including this application) be placed under seal until further order of this Court.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar 481052

By: */s/ Tejpal. S. Chawla*

16

Tejpal S. Chawla
Assistant United States Attorney
D.C. Bar No. 464012
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
202-252- 7280
tejpal.chawla@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF: 314 SHELBY STREET, SHELBYVILLE, INDIANA UNDER RULE 41** | **SW No. 21-sw-391** <br><br> **Filed Under Seal** |

**ORDER**

This matter having come before the Court pursuant to the application of the United States to issue this warrant under Rule 41(b)(3) and to file under seal the above-captioned warrant and related documents, including the application and affidavit in support thereof and all attachments thereto and other related materials (collectively the "Warrant"), the Court finds that this Warrant relates to an investigation involving domestic terrorism, and that, because of such reasonable grounds to believe the disclosure will result in flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation, the United States has established that a compelling governmental interest exists to justify the requested sealing.

1.      IT IS THEREFORE ORDERED that the application is hereby GRANTED, and

2.      IT IS FURTHER ORDERED that the above Warrant be issued pursuant to Rule 41(b)(3) for property located in the Southern District of Indiana;

3.      IT IS FURTHER ORDERED that that the warrant, the application and affidavit in support thereof, all attachments thereto and other related materials, the instant application to seal, and this Order are sealed until otherwise ordered by the Court; and

4.      IT IS FURTHER ORDERED that the Clerk's office shall not make any entry on the public docket of the Warrant until further order of the Court.

1

Date: November 16, 2021

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

cc:     Tejpal S. Chawla
        Assistant United States Attorney
        United States Attorney's Office
        555 Fourth Street, N.W.
        Washington, D.C. 20530